IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| VERTICAL COMPUTER SYSTEMS, INC., | § § § | |
| Plaintiff, | § | CIVIL ACTION NO. 2:07-CV-144 (DF-CE) |
| | § | |
| v. | § | |
| | § | |
| MICROSOFT CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**MICROSOFT'S BRIEF ON CLAIM CONSTRUCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

INDEX TO EXHIBITS ........................................................................................... v

I.  INTRODUCTION ........................................................................................ 1

II.  BACKGROUND OF THE TECHNOLOGY ................................................. 4

    A.  WebOS ................................................................................................ 4

    B.  The Purported Invention of the '744 Patent ....................................... 6

    C.  Prosecution of the '744 Patent ........................................................... 7

III.  PROPOSED CONSTRUCTIONS FOR THE '744 PATENT ......................... 9

    A.  "Arbitrary Object" / "Object" / "Arbitrary Name" ............................ 9

        1.  Microsoft's Construction of "Arbitrary Object" Follows the Consistent Usage of this Term in the '744 Patent Specification ............. 10

        2.  Microsoft's Construction of "Arbitrary Name" Follows the Consistent Usage of this Term in the '744 Patent Specification ............. 13

        3.  The Word "Object" Does Not Need To Be Defined Separately from the Claim Term "Arbitrary Object" ................................. 14

    B.  "Arbitrary Object Framework" ......................................................... 16

        1.  "Arbitrary Object Framework" as Used in the Preambles of the Claims Is a Limitation ................................................. 16

        2.  "Arbitrary Object Framework" Cannot Be Given Reasonable Meaning, Rendering the Claims Fatally Indefinite .................. 17

        3.  Microsoft's Alternative Construction ......................................... 20

    C.  "Content" / "Form" / "Functionality" ............................................... 21

        1.  "Content," "Form," and "Functionality" Do Not Require Construction ............................................................................ 21

        2.  Microsoft's Alternative Constructions ..................................... 22

            a)  "Content" ...................................................................... 22

            b)  "Form" .......................................................................... 23

   c) "Functionality"...............................................................24

 D. "That Separates a Content of Said Computer Application …".............................26

  1. The Term "That Separates a Content of Said Computer Application …" as Used in the Preambles of Claims 1 and 26 Is Limiting..............................................................26

  2. Microsoft's Proposed Construction Is Consistent With the Intrinsic Record.............................................................28

  3. Applicant Disavowed Claim Scope that Would Allow Combination of Any Two or More of Content, Form and Function .........29

IV. CONCLUSION...........................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Atmel Corp. v. Information Storage Dev., Inc.*,
   198 F.3d 1374 (Fed. Cir. 1999) ..................................................................................... 2

*Bell Atlantic Network Svcs., Inc. v. Covad Commc'ns Group, Inc.*,
   262 F.3d 1258 (Fed. Cir. 2001) ............................................................................... 10, 30

*Bicon, Inc. v. The Straumann Co.*,
   441 F.3d 945 (Fed Cir. 2006) ............................................................................. 3, 17, 27

*Chimie v. PPG Indus.*,
   402 F.3d 1371 (Fed. Cir. 2005) ................................................................................... 30

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005). ................................................................................. 18

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A.*,
   412 F.3d 1291 (Fed. Cir. 2005) ..................................................................................... 2

*Halliburton Energy Svcs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) ........................................................................... 3, 19, 26

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
   488 F.3d 982 (Fed. Cir. 2007) ............................................................................. 2, 10, 20

*In re Cruciferous Sprout Litig.*,
   301 F.3d 1343 (Fed. Cir. 2002),
   *cert. denied sub nom Brassica Protection Products LLC v. Sunrise Farms*,
   538 U.S. 907 (2003) ................................................................................................ 3, 26

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
   430 F.3d 1377 (Fed. Cir. 2005) ................................................................................... 24

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
   383 F.3d 1295 (Fed. Cir. 2004) ................................................................................... 10

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir.),
   *cert. denied*, 543 U.S. 821 (2004) ............................................................................. 30

*Nike Inc. v. Wolverine World Wide, Inc.*,
   43 F.3d 644 (Fed. Cir. 1994) ....................................................................................... 21

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005) ............................................................................. 3, 27

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) .................................................................................. 29

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
    442 F.3d 1331 (Fed. Cir.),
    *cert. denied*, 127 S. Ct. 683 (2006) .......................................................................... 16

*Orion IP, LLC v. Staples, Inc.*,
    406 F. Supp. 2d 717 (E.D. Tex. 2005) ...................................................................... 21

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005),
    *cert. denied*, 546 U.S. 1170 (2006) ................................................................. 2, 9, 10

*Retractable Techs. v. New Med. Techs.*,
    2004 U.S. Dist. LEXIS 3855 (E.D. Tex. Jan. 8, 2004) .............................................. 14

*United States Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir.),
    *cert. denied*, 522 U.S. 950 (1997) ........................................................................... 21

*V-Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005) .................................................................................. 29

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ................................................................................... 10

**Statutes**

35 U.S.C. § 112, ¶ 2 .......................................................................................................... 2, 17

## <u>INDEX TO EXHIBITS</u>

Exh. A       Microsoft's Comparison Chart of Parties' Proposed Constructions for '744 Patent

Exh. B       Declaration of Brian Eutermoser

   B.1    Jan. 28, 2003 Amendment and Response

   B.2    Oct. 22, 2003 Response

   B.3    April 30, 2004 Response

   B.4    Excerpts from Adhesive Software web site describing WebOS

   B.5    *Small Adhesive Carries Big Stick*, AUSTIN BUSINESS JOURNAL (Jan. 9, 1998)

## I.      INTRODUCTION

Pursuant to P.R. 4-5(a) and the Court's Scheduling Order, defendant Microsoft Corporation respectfully submits this opening brief on the proper construction of disputed claim terms of the patent-in-suit, U.S. Patent No. 6,826,744 ("the '744 patent").   Microsoft also provides, for the Court's convenience, a chart with the full text of the claims and the parties' respective proposed constructions.  [Exh. A]

As the claim comparison chart shows, the parties have staked out markedly different claim construction positions.   The differences in the parties' proposed constructions derive principally from the parties' fundamentally different claim construction methodologies.   Because the Court is well familiar with the established principles and basic canons of claim construction, Microsoft limits its discussion of the law to the specific issues pertinent to the parties' disputes.  Three areas of dispute permeate the parties' respective claim constructions:

(1)      whether claim terms should be construed in the context of the specification and the claims in which the terms are found (as Microsoft contends), or in an abstract context based principally on alleged "ordinary meaning" (as Vertical contends);

(2)      whether a vague claim term that has no ordinary meaning nor adequate support in the patent's written description renders the claims fatally indefinite; and

(3)      whether preamble language that contains "essential features" of the claimed invention, provides antecedent basis for the body of the claims, and/or was also relied upon by the applicant to distinguish his purported invention from the prior art should be deprived of limiting effect, as Vertical contends.

The first of these disputes derives from the fact that Vertical seeks constructions that require this Court to disregard virtually every important statement in the specification and the prosecution history of the '744 patent.   A prime example of this is Vertical's proposed

construction of "arbitrary name."  Ignoring the relevant portions of the specification and claims, Vertical proposes that this term be construed as merely an "identifier assigned to an arbitrary object."  When viewed, however, in the required context of the specification and the claims themselves (as it must be),[1] "arbitrary name" cannot be construed so broadly, but must be limited to what Vertical concedes is a "central feature" of its purported invention—specifically, being "all that is needed" to provide access to an arbitrary object.  Similar reasoning applies to Vertical's other revisionist constructions.

The second dispute involves the term "arbitrary object framework," which Microsoft contends is indefinite and not susceptible of construction.  A determination of indefiniteness is appropriate at the claim construction stage because the analysis of indefiniteness under section 112, ¶ 2 is a question of law that is "drawn from the court's performance of its duty as the construer of patent claims."  *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) (quoting *Atmel Corp. v. Information Storage Dev., Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999)).  Where, as here, a claim term has no customary meaning, the Federal Circuit has instructed that "the specification usually supplies the best context for deciphering claim meaning."  *Honeywell*, 488 F.3d at 991.  Far from providing adequate notice to the public, however, the '744 patent specification merely describes functions that such an "arbitrary object framework" <u>might</u> perform, leaving open the questions of what this entity is or how it works.  Under similar circumstances, the Federal Circuit has concluded that an inadequately defined claim term was "insolubly ambiguous," rendering the patent claims fatally

---

[1] *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*) (noting that the person of ordinary skill in the art is deemed to read the claim term "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification"), *cert. denied*, 546 U.S. 1170 (2006); *see also Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 991 (Fed. Cir. 2007) (explaining that "the specification usually supplies the best context for deciphering claim meaning").

indefinite.  *Halliburton Energy Svcs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008) (affirming the grant of summary judgment of indefiniteness of patent claims directed to a "method for conducting a drilling operation in a subterranean formation using a fragile gel drilling fluid …" because the specification provided only a vague functional description for the novel term "fragile gel" as used in the claim preamble, leaving the term "insolubly ambiguous"). Vertical's attempt to construe this term in purely functional terms only underscores its indefiniteness, as Vertical's proposed construction merely suggests functions that the framework "can" perform, and even then simply echoes other limitations already stated in the claims.

The third dispute centers on Vertical's belated, litigation-inspired attempt to strip the limiting effect from the preambles of sole independent claims 1 and 26, contrary to the applicant's reliance on the preambles during prosecution to attempt to differentiate over the prior art as well as contrary to the preambles' reciting essential elements of the invention and providing necessary antecedent bases for the bodies of the claims.  Vertical's effort to evade the limiting effect of the claim preambles defies established Federal Circuit precedent.  *See, e.g.*, *Bicon, Inc. v. The Straumann Co.*, 441 F.3d 945, 952-53 (Fed Cir. 2006) (concluding that preamble was limiting because it recited essential structural features of the invention); *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1305-06 (Fed. Cir. 2005) (concluding that preamble was limiting because it provided antecedent basis for limitations in the claim body); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1347-48 (Fed. Cir. 2002) (holding that preamble was a limitation because of "clear reliance by the patentee on the preamble to persuade the Patent Office that the claimed invention is not anticipated by the prior art"), *cert. denied sub nom Brassica Protection Products LLC v. Sunrise Farms*, 538 U.S. 907 (2003).  Application of these established principles requires treating the preambles of claims 1 and 26, including the terms "arbitrary object framework" and "that separates …," as limiting.

For the reasons discussed herein, Microsoft respectfully requests that the Court adopt Microsoft's proposed constructions of the disputed claim terms.

## II.    BACKGROUND OF THE TECHNOLOGY

Vertical commences its brief by extolling the purported invention of the '744 patent as a "major advance" over the prior art because it allegedly introduced the "new" concept of "arbitrary objects."  [Vertical CC Br. at 1-2]  According to Vertical, arbitrary objects are new because they "can be retrieved by name only."  But the retrieval of objects by name only was known years before the '744 patent was filed.  Indeed, one such prior art system—called "WebOS"—was developed by the named inventor of the '744 patent and was disclosed, and actually sold, to the public more than a year before the October 1, 1999 filing date of that patent.

### A.    WebOS

In 1995, the named inventor of the '744 patent—Aubrey McAuley—founded a company called Adhesive Software, Inc.  [*See* Exh. B.5 (*Small Adhesive Carries Big Stick*, AUSTIN BUS. JOURNAL, Jan. 9, 1998) at 2]  Adhesive advertised itself as "a software development and Internet services company."  [*See* Exh. B.4 (Adhesive web site) at MSVERT96500][2]  McAuley and Adhesive purportedly created WebOS and began advertising it on Adhesive's web site at least as early as 1997.  [*Id.*]  According to Adhesive's web site, "WebOS [was] a mature suite of web site management development tools that enable[d] webmasters and developers to produce fully interactive Web sites in a logical and controllable fashion."  [*Id.*]  "Through its powerful Web Object-Management Facility, WebOS[TM] [could] transform a static Web site into living information."  [*Id.*]  In addition to describing what WebOS was and how it worked, Adhesive's web site also included a diagram of WebOS's Web Object Management Facility:

---

[2] Exh. B.4 is a printed copy of excerpts of Adhesive's web site as it existed on February 3, 1998.  All of the pages that this brief cites from Adhesive's web site were last modified on October 25, 1997.  Microsoft obtained this document through Internet Archive (www.archive.org).



[*Id.* at 96509]  WebOS's Web Object Management Facility was "a comprehensive management framework" [*id.* at 96516] that "enable[d] the developer to create dynamic data and logic objects that [could] be used and re-used throughout a Web site."  [*Id.* at 96514]

Most significantly for purposes of the present discussion, Adhesive's web site showed that, in WebOS, objects could be retrieved using only the object's name.  Adhesive's web site identified, for example, an object named "adhesive_pwebos," which was a database query that, when retrieved, searched a particular database for Adhesive's current clients and returned a list of those clients.  [*Id.* at 96510]  If a developer wanted to create a web page that used the adhesive_pwebos object, he or she would insert into the HTML source document for that web page the name of the object between # marks.  [*Id.*]  The resulting HTML source document would look like this:

#adhesive_pwebos#

[*Id.*]  Note that the developer would not have to enter any parameters for the object such as the

name of the database to be searched or the search query to be used.  When a web browser sent a request to see the web page, the WebOS Object Management Facility would parse the source HTML document, retrieve the adhesive_pwebos object by name only, receive from the object a list of Adhesive's current clients, and send that list to the web browser.  [*Id.*]  The resulting list was shown on the Adhesive web site under the heading "Sites Using WebOS[TM]."  [*Id.* at 96511; *see also id.* at 96536-37]

In addition to disclosing WebOS, Adhesive's web site offered WebOS for sale at the "base price of $4995."  [*Id.* at 96508, 96512]  Adhesive's actual sales of WebOS were touted on Adhesive's own web site, which listed at least sixteen "Sites Using WebOS[TM]" as of October 25, 1997.  [*Id.* at 96511]

### B.     The Purported Invention of the '744 Patent

The application for the '744 patent was filed on October 1, 1999.  The '744 patent purports to disclose a method for generating software applications, including web sites, in an "arbitrary object framework."  [*See* '744 patent at 2:9-11]  According to the patent, "[t]he method of the present invention separates content, form, and function of the computer application so that each may be accessed or modified independently."  [*Id.* at 2:11-14]  Figure 2 of the '744 patent is a workflow diagram purportedly illustrating the separation of content, form and function in the development of a software application or web site:



The method of the purported invention also allegedly includes creating "arbitrary objects" for generating content, form and functionality, managing those arbitrary objects in an object library, and deploying those objects into a design framework or container page to create the application or web site.  [*Id.* at 2:14-18, 7:22-30, 8:22-28]

Figure 5 of the '744 patent purportedly "shows the components of one embodiment of the present invention used to generate web sites" [*id.* at 3:5-7, 5:4-5]:



*FIG. 5*

Notably, Figure 5 is <u>virtually identical</u> to the WebOS diagram shown on Adhesive's web site at least as early as October 25, 1997 (*see supra* p. 5).[3]

### C.    Prosecution of the '744 Patent

The prosecution of the '744 patent spanned nearly five years, requiring three responses by the applicant along with arguments aimed at distinguishing the claimed invention over the several references cited by the Patent Office examiner.  During the course of prosecution, the

---

[3] While the inventor disclosed to the Patent Office that WebOS was an embodiment of the purported invention of the '744 patent [*see* '744 patent at 5:4-17], he did not disclose that WebOS was disclosed, and sold, to the public more than a year before the filing date of the '744 patent.

applicant emphasized two points in particular as supporting allowance of the claims:

1. <u>Separation of content, form, and functionality</u>:  The applicant insisted that the prior art references allegedly did "not disclose a method for generating a computer application or web site on a host system that <u>separates</u> content, form and functionality of the computer application or web site and <u>creating arbitrary objects for generating</u> the content, form and functionality thereof, as claimed in claims 1 and 26."  [Exh. B.3 (April 30, 2004 Resp.) at 13 (emph. added)]

2. <u>Disavowal of coverage of classes that combine two or more of content, form and functionality</u>:  The applicant distinguished one prior art reference by arguing that "one or more of the Johnson classes includes two or more of 'a content … a form … and a functionality of the computer application' and no set of Johnson classes separates 'a content … a form… and a functionality of the computer application,' as claimed in claim 1."  [Exh. B.1 (Jan. 28, 2003 Amend. and Resp.) at 4-5]  In other words, applicant clearly disclaimed any claim scope that encompasses a method in which two or more of content, form and functionality are combined.

These points are reflected in Microsoft's proposed constructions, as they must be.  On the other hand, Vertical's disregard of these clear expressions of claim scope in the prosecution history, in addition to other violations of fundamental canons of claim construction, render Vertical's proposed constructions improper.

## III.   PROPOSED CONSTRUCTIONS FOR THE '744 PATENT

The disputed terms submitted for construction appear in each of claims 1 and 26, which are the only two independent claims in the '744 patent.  Therefore, the Court's construction of these terms affects every asserted claim.[4]

### A.   "Arbitrary Object" / "Object" / "Arbitrary Name"

| Claim Term | Microsoft's Proposed Construction | Vertical's Proposed Construction |
|---|---|---|
| arbitrary object | Any combination of application logic and data desired by the developer that is interchangeable with another arbitrary object of another type. | An object that can be created independently by individual preference and that can be accessed solely by name. |
| object | This term does not require a construction separate from the construction of "arbitrary object."  To the extent that the Court decides to construe this term separately, Microsoft proposes that it mean:  "a combination of application logic and data" | An entity that can have form, content or functionality or any combination of form, content and functionality. |
| arbitrary name | Any name desired by the developer that is all that is needed to access the object. | An identifier assigned to an arbitrary object. |

Vertical insists (incorrectly) that "the '744 patent introduces 'arbitrary objects' into this technological field."  [Vertical CC Br. at 7]  Yet, even as Vertical touts the alleged uniqueness of terms "arbitrary object" and "arbitrary name," Vertical ignores their consistent usage in the specification.

The importance of the written description in claim construction derives in part from the statutory directive that the inventor must provide a "full" and "exact" description of the claimed invention, which mandates that the written description necessarily inform the proper construction of the claims.  *Phillips*, 415 F.3d at 1316 (quoting 35 U.S.C. § 112, ¶ 1).  As the Federal Circuit

---

[4] Contrary to Vertical's representation that it proposes a single term for construction (namely, "arbitrary object"), in fact it was Vertical, not Microsoft, that insisted on offering for construction fully half of the terms presented in the parties' Joint Claim Construction Statement ("JCCS").  As addressed further herein, Microsoft has provided constructions for "object," "form," "content," and "functionality" only because Vertical has insisted on doing so.

has explained, "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). A corollary to this fundamental canon of claim construction is the well-established principle that the patentee can act as his own lexicographer and provide special definitions of his claim terms in the patent specification or file history. *Vitronics Corp.*, 90 F.3d at 1582 . Where a term has been defined by the inventor, the court is to construe that term "only as broadly as provided for by the patent itself." *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) (affirming construction of term "group key" based on the usage of that term in the specification); *Honeywell*, 488 F.3d at 991 (holding that district court did not improperly "import a limitation" by construing the claim term "terrain floor boundary" as defined by the specification). Moreover, even when guidance for claim terms is not provided in explicit definitional format, the specification may define claim terms "by implication" such that the "meaning may be found in or ascertained by a reading of the patent documents." *Irdeto Access, Inc.*, 383 F.3d at 1300; *see also Bell Atlantic Network Svcs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (holding that the patentees defined a term by implication via its consistent use throughout the patent specification).

As demonstrated herein, Microsoft's proposed constructions of the terms "arbitrary object" and "arbitrary name" do not, as Vertical insists, improperly import limitations into the claims, but rather follow the consistent usage of these terms provided in the specification.

### 1. Microsoft's Construction of "Arbitrary Object" Follows the Consistent Usage of this Term in the '744 Patent Specification

The specification is inherently sketchy as a general proposition, but what definition it does provide for "arbitrary object" is identical to the construction proposed by Microsoft. The

specification first describes what an "arbitrary object" is, stating that "arbitrary objects may include any combination of application logic and data desired by a developer."  ['744 patent at 3:42-43]  Although Vertical contends that the permissive term "may" undermines the definitional force of this language, the specification actually underscores the weight of this definition by repeating it <u>verbatim</u> in describing a second embodiment of the invention.  [*Id.* at 4:20-21]  The claims further specify that the "arbitrary objects" are of "various object types for generating" content, form, and functionality.[5]  A fundamental characteristic of "arbitrary objects" in the context of the "present invention," according to the specification, is that arbitrary objects of the various different types are "<u>interchangeable</u>":

- "[A]n object of one type can be easily replaced with another object of another type." ['744 patent at 3:59-61 (discussing embodiment of FIG. 3)]

- "One arbitrary object can be easily replaced with another arbitrary object of another type." [*Id.* at 4:40-41 (discussing embodiment of FIG. 4)]

- "The present invention allows different object types to be interchangeable." [*Id.* at 6:13-14]

The requirement that the "arbitrary objects" of different types be interchangeable is also illustrated by dependent claims 22 and 44, which require that an object of one type actually be "swapp[ed]" with an arbitrary object of another type.  Such "swapping" could not occur if different types of arbitrary objects were not interchangeable.

Consistent with established Federal Circuit precedent, Microsoft's proposed construction of "arbitrary object" follows the consistent usage of this term provided in the specification. Microsoft's construction first states what an "arbitrary object" is ("[a]ny combination of application logic and data desired by the developer").  This not only follows the definition

---

[5] Examples of various object types include "text file pointers, binary file pointers, compiled executables, scripts, data base queries, shell commands, remote procedure calls, global variables and local variables." [*Id.* at 3:43-46; 4:22-26]

provided by the specification [*see* '744 patent at 3:42-43], but further is consistent with the teachings of the specification that "any underlying functionality of the operating system used by the host system can be defined as an object within the arbitrary framework." [*Id.* at 4:33-37; 5:45-53]  Microsoft's proposed construction further incorporates the defining characteristic that is emphasized by the specification ("… that is interchangeable with another arbitrary object of another type").   In this way, Microsoft's proposed construction captures the notion of the arbitrariness of the object that is provided in the '744 patent specification, as noted above.

Vertical's proposed construction of "arbitrary object," on the other hand, suffers from several basic flaws, which lead to a construction that is confusing, misleading, and ultimately not helpful to the fact finder.  Specifically, Vertical's construction:  (1) fails to follow the consistent usage of this term provided in the specification; (2) misplaces the concept of "arbitrary name" by incorporating it into the definition of "arbitrary object"; and (3) relies on a separate definition of "object," which need not and should not be separately defined.  As to the first point:  contrary to Vertical's unfairly denigrating Microsoft's proposed construction as based on litigation-inspired "cherry pick[ing]," in fact it is Vertical's construction that defies the clear teachings of the specification.   In particular, Vertical's construction conspicuously omits the concept of interchangeability, which, as noted above, is emphasized repeatedly in the specification as a key aspect of arbitrary objects.  ['744 patent at 3:59-61; 4:40-41; 6:13-14]   And part of what Vertical's construction does include—an "object that can be created independently by individual preference"—does not find support in the specification.   The latter portion of Vertical's construction ("and that can be accessed solely by name")[6] is also ambiguous—it is unclear whether the <u>only</u> way to access the object is by name, or whether the name is merely <u>sufficient</u> to

---

[6] Vertical's chart in its brief (p. 8) omits the word "solely" from its construction of "arbitrary object" as provided in the JCCS.  Vertical's counsel has confirmed that this omission is a typographical error.

access the object.  Moreover, incorporation of the features of an "arbitrary name" into the definition of "arbitrary object" is misplaced and confusing.  Finally, as also discussed *infra*, the term "arbitrary object" should not rely upon or incorporate a separate definition of the word "object," as Vertical's construction does.

### 2.    Microsoft's Construction of "Arbitrary Name" Follows the Consistent Usage of this Term in the '744 Patent Specification

The specification defines the term "arbitrary name" by implication when it contrasts the claimed invention from "traditional" models by stating that, in the claimed invention, functions stored within an object library "can be accessed by name arbitrarily," whereas the "traditional model" required that the "function must be explicitly invoked with all its parameters included." ['744 patent at 5:42-46 (emph. added)]  With regard to what it means to access an object by name "arbitrarily," the specification explains that "[a]ll that is needed is the name of the function in order to access the function."  [*Id*. at 5:54-55 (emph. added); *see also* 4:39-42:  "The arbitrary object can be accessed by an arbitrary object name."]  This feature—allowing access of objects using only the object's name—is in fact part of the alleged "distinction" described by the specification of the claimed invention over the prior art of record.  Whereas the prior art allegedly required knowing how a function could be called and what it would return, the specification explains that in the claimed invention it is enough to "just know[] the function's name."  [*Id*. at 5:62-65]  Vertical insists that this feature is "central" to its invention, but disputes whether this feature is properly identified as part of the term "arbitrary name," as proposed by Microsoft, instead of as part of the term "arbitrary object," as proposed by Vertical.

Vertical's proposed construction of "arbitrary name" not only leaves out the key concept of being sufficient to provide access to an arbitrary object, but effectively reads out the term "arbitrary," changing the concept of "arbitrary name" from what is described in the specification

to something very different—merely an "identifier assigned to an arbitrary object."  Vertical's terse discussion in its brief does not explain what it means for an "identifier" to be "assigned to" an arbitrary object, and leaves other questions unanswered as well:  Is the assignment made by the developer, or internally within the program itself?  Is the assignment permanent or merely temporary?  These open issues will only spark confusion by the jury, rendering Vertical's construction manifestly unhelpful.

### 3. The Word "Object" Does Not Need To Be Defined Separately from the Claim Term "Arbitrary Object"

Microsoft agrees with Vertical that "[t]he '744 patent does not use the term 'object' apart from the work 'arbitrary.'"  [Vertical CC Br. at 7]  But, contrary to Vertical's representation that it believes only the term "arbitrary  objects" requires construction, it was Vertical that insisted on presenting the term "object" for separate construction.  Microsoft submits that because the word "object" is not used separately from the term "arbitrary object" in the claims, as Vertical admits, construing it separately would only complicate claim construction unnecessarily and lead to jury confusion.  *See, e.g.*, *Retractable Techs. v. New Med. Techs.*, 2004 U.S. Dist. LEXIS 3855 at **27-28 & n.6 (E.D. Tex. Jan. 8, 2004) (Davis, J.) (refusing to construe word "stopper" separately from claim term "releasable stopper," commenting that to do so would "unnecessarily multiply and complicate the issues in this claim construction").

If, however, this Court chooses to provide a separate construction of the word "object," Microsoft proposes that it be construed consistently with the teachings of the specification to mean "a combination of application logic and data."  [*See* '744 patent at 3:42-43:  "Arbitrary objects may include any combination of application logic and data … ."]

Vertical's proposed construction, on the other hand, derives no support from the specification and is contrary to the language of the asserted claims.  Contrary to Vertical's

attempt to define an "object" as itself having "form, content or functionality," or a combination thereof, the written description and the claims themselves teach that it is the <u>computer application</u> that has form, function and content.  [*See, e.g.*, Claim 1:  "A method for generating a computer application on a host system in an arbitrary object framework that separates a content of said computer application, a form of said computer application and a functionality of said computer application … ."]  The arbitrary objects are entities that are executed to <u>generate</u> the content, form, or functionality of the application.  [*See, e.g.*, *id*:  "creating arbitrary objects with corresponding arbitrary names of various object types <u>for generating</u> said content … said form … and said functionality…" (emph. added)]  Thus, it does not make sense to define an "object" as Vertical has proposed.  But even if an object were simply an entity that "can have" form, content, functionality or some combination of the three, such an open-ended "definition" tells the fact finder nothing, and Vertical's construction should be rejected as unhelpful and confusing.

Vertical's construction of "object" is also incorrect because it suggests merging form, content and functionality in "any combination," which goes against the patent's fundamental teaching that form, functionality, and content are to be <u>separated</u>.  [*See, e.g.*, '744 patent at 3:17-19:  "The method <u>separates</u> content, form, and function of the software application so that each can be accessed or modified <u>independently</u>" (emph. added); *see also* FIG. 2]  This point is not only a common thread running throughout the '744 patent, from the Abstract to the claims, but was emphasized repeatedly during prosecution.  In response to the third Office Action, for example, the applicant distinguished three cited references on the ground that they did "not disclose a method for generating a computer application or web site on a host system that <u>separates</u> content, form and functionality of the computer application or web site and <u>creating arbitrary objects for generating</u> the content, form and functionality thereof, as claimed in claims 1 and 26."  [Exh. B.3 (April 30, 2004 Resp.) at p. 13]  If a single "object" could itself be a

combination of content, form and functionality, then the fundamental purpose of the claimed invention—to keep those entities separate—could not be met.  Vertical's proposed construction thus defies the teachings of the '744 patent, and cannot be adopted.

In short, Microsoft's constructions of the terms "arbitrary object" and "arbitrary name" are faithful to the consistent usage of those terms in the patent specification.  Vertical's proposed constructions of these terms, on the other hand, misplace fundamental concepts, defy the specification, and are ultimately confusing and unhelpful.

### B.      "Arbitrary Object Framework"

| Claim Term | Microsoft's Proposed Construction | Vertical's Proposed Construction |
|---|---|---|
| arbitrary object framework | This term is indefinite.<br><br>To the extent that the term can be given any meaning, Microsoft proposes that it mean:  "a framework that allows arbitrary objects to be referenced in a consistent manner regardless of type" | A hierarchical system that can separate content, form and functionality to generate a product, and facilitates creation of arbitrary objects,  management of arbitrary objects, and deployment of arbitrary objects. |

The '744 specification, while generally vague and sketchy, falls completely short of providing sufficient disclosure to support construction of the term "arbitrary object framework." Microsoft therefore submits that this term cannot be construed, and is hence indefinite, rendering the claims invalid as a matter of law.

### 1.      "Arbitrary Object Framework" as Used in the Preambles of the Claims Is a Limitation

Vertical first attempts to deflect scrutiny of this term by insisting that its placement in the claim preambles deprives it of any limiting effect.  In considering whether the preambles limit the claims, this Court must analyze each preamble to ascertain "whether it states a necessary and defining aspect of the invention, or is simply an introduction to the general field of the claim." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir.) (rejecting

district court's construction of preamble as nonlimiting, concluding that the preamble "serve[d] to focus the reader on the invention that is being claimed"), *cert. denied*, 127 S. Ct. 683 (2006); *see also Bicon, Inc. v. The Straumann Co.*, 441 F.3d 945, 952-53 (Fed Cir. 2006) (concluding that preamble was limiting because it "recite[d] essential elements of the invention").  Here, the preambles of claims 1 and 26 do not merely provide an introduction, but rather recite "essential elements" of the claimed invention.  Indeed, the notion of an "arbitrary object framework" is central to the '744 patent, commencing with the title of the patent ("System and Method for Generating Web Sites in an Arbitrary Object Framework"), which is repeated in the Abstract, and emphasized throughout the written description.  [*E.g.*, '744 patent at 3:14-16:  "The present invention provides a system and method for using a hierarchical, <u>arbitrary object framework</u> for generating software applications." (emph. added)]  Thus, the term "arbitrary object framework," being at the core of Vertical's claimed invention, certainly meets the "essential elements" test.  Vertical's attempt to avoid the limiting effect of this term defies controlling precedent and should be rejected.

### 2.    "Arbitrary Object Framework" Cannot Be Given Reasonable Meaning, Rendering the Claims Fatally Indefinite

Although the notion of an "arbitrary object framework" is essential to Vertical's claimed invention, the '744 patent fails to adequately define this term, leaving the boundaries of the claims uncertain.  The requirement of definiteness in patent claims derives from the statutory requirement that the patent specification must conclude with "one or more claims particularly pointing out and distinctly claiming the subject matter which applicant regards as his invention." 35 U.S.C. § 112, ¶ 2.  Because the claims perform the fundamental function of delineating the scope of the invention, the purpose of the definiteness requirement "is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the

patentee's right to exclude."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).  Definiteness of claim terms depends on whether those terms can be given any reasonable meaning.  *Id.* (affirming summary judgment of invalidity on grounds that term "aesthetically pleasing" could not be defined, rendering claims indefinite as a matter of law).

The term "arbitrary object framework" cannot be given reasonable meaning.  This is not a term defined in the art, nor did the inventor fulfill his duties as lexicographer.  Although the specification mentions the "arbitrary object framework" repeatedly, also ascribing to it various purposes and functions, the specification never explains what the arbitrary object framework <u>is</u> or <u>how</u> it satisfies these purposes or carries out its functions.  For example, the "arbitrary object framework" supposedly:

- "allows arbitrary objects to be referenced in a consistent manner regardless of the type" ['744 patent at 3:47-48, 4:26-28];

- "allows local arbitrary objects to either override global parent arbitrary objects or inherit capabilities and data from the global parent, regardless of the type of the local arbitrary object" [*Id.* at 3:49-52, 4:29-32];

- "can be designed such that objects and variables can be kept in the same name space, every object can have access to all the environmental settings, and every object pointer can potentially be another name in the name space." [*Id.* at 6:16-20]

These purely functional attributes plainly fail to provide the requisite notice of the boundaries of the claims.

Vertical also struggles, but fails, to define this term.  Like the patent itself, Vertical's proposed construction is stated in purely functional terms, purporting to define the "arbitrary object framework" by what it allegedly "can" do, without saying what it is (beyond the vague "hierarchical system") or how it "can" achieve those functions.  The resulting "definition" is open-ended, vague, and confusing.  It is also redundant because it restates the other limitations in the claims (although it does not correctly restate them). And the lack of boundaries afforded by

Vertical's construction is compounded by the permissive nature of the construction, stating merely that the arbitrary object framework "can" perform the listed functions.

The Federal Circuit recently explained that defining claim limitations in purely functional terms, while not improper *per se*, can render "the task of determining whether that limitation is sufficiently definite" to be "a difficult one that is highly dependent on context (*e.g.*, the disclosure in the specification and the knowledge of a person of ordinary skill in the relevant art area)." *Halliburton Energy Svcs.*, 514 F.3d at 1255. In *Halliburton*, the court affirmed the grant of summary judgment of indefiniteness of patent claims directed to a "method for conducting a drilling operation in a subterranean formation using a fragile gel drilling fluid …" because the term "fragile gel" as used in the claim preamble was "insolubly ambiguous." In so doing, the court considered but rejected several of the patentee's proposed definitions that were primarily based on the functions of the fragile gel but failed to provide a precise structure (such as a composition). The court admonished that the patent drafter could have avoided the ambiguities by, *inter alia*, "using a quantitative metric (e.g., numeric limitation as to a physical property) rather than a qualitative functional feature." *Id*. at 1255-56.

This is not to say that a claim term cannot be defined in functional terms, but the *Halliburton* case teaches that attempting to do so requires that the patent be especially clear. The '744 patent is anything but clear in defining an "arbitrary object framework." And Vertical's proposed construction, if anything, only exacerbates the vagueness of this term by merely attempting to echo other limitations in the claim. Vertical's functional, redundant, and incorrect "definition" should be rejected, and the term "arbitrary object framework" should be determined to be insolubly ambiguous, rendering the claims indefinite as a matter of law.

### 3.    Microsoft's Alternative Construction

Should this Court determine that this term is not insolubly ambiguous, Microsoft proposes a construction that remains true to the alleged invention as best as it can be understood. Microsoft's proposed construction is derived directly from the specification:  "The arbitrary object framework allows arbitrary objects to be referenced in a consistent manner regardless of the type."  ['744 patent at 3:47-48]  Indeed, this is the primary description of an arbitrary object framework provided in the specification, and is consistent with the patent's descriptions of "arbitrary objects" and "arbitrary names," as discussed *supra*.  Thus, to the extent this term is susceptible of any construction, Microsoft submits that this construction is appropriate and should be adopted.

Vertical's criticism of Microsoft's proposed construction is premised on Microsoft's allegedly choosing one sentence from the specification over another, but even as Vertical asserts that Microsoft could have chosen a different sentence, it concedes that the alternative selection would itself have been "improper."  [Vertical CC Br. at 17]  Vertical's objection to Microsoft's construction thus boils down to Microsoft's reliance on the specification to define the term "arbitrary object framework," which is not only proper, but necessary.  *See Honeywell*, 488 F.3d at 991 (holding that district court did not improperly "import a limitation" by construing the claim term "terrain floor boundary" as defined by the specification).

C.      "Content" / "Form" / "Functionality"

| Claim Term | Microsoft's Proposed Construction | Vertical's Proposed Construction |
|---|---|---|
| content | Written, recorded, or illustrated documentation of the computer application [web site], such as photographs, illustrations, product marketing material, and news articles that can be created by writers, photographers, artists, reporters or editors. | Data. |
| form | The look of the computer application [web site], including graphic designs, user interfaces, and graphical presentations that can be created by a designer or group of designers. | Formatting. |
| functionality | Software code or scripts to implement the actions of the computer application [web site] that can be created by a programmer or group of programmers. | Software code. |

### 1.      "Content," "Form," and "Functionality" Do Not Require Construction

This trio of terms is another set of terms that Vertical has insisted on construing, despite Microsoft's position that these terms do not require construction.  As the Federal Circuit has admonished, claim construction is "not an obligatory exercise in redundancy,"[7] and "although every word used in a claim has a meaning, not every word requires a construction."  *Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 738 (E.D. Tex. 2005) (Davis, J.).  Yet, even though it has insisted on requiring the Court to construe these terms, Vertical has proposed terse "definitions" that simply substitute one word (or pair of words) for another word.  Such a "construction" is tantamount to simply rewriting the claims, which is certainly not the purpose of claim construction.  *See, e.g.*, *Nike Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 647 (Fed. Cir. 1994) (rejecting construction that essentially substituted "inflated" with "containing":  "Nike cannot, in effect, rewrite its patent claims to suit its needs in this litigation").

---

[7] *United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir.), *cert. denied*, 522 U.S. 950 (1997).

### 2.     Microsoft's Alternative Constructions

If this Court does determine that these terms warrant construction, Microsoft submits that its constructions, which follow the teachings of the specification as explained below, would be more helpful to a jury in clarifying the meaning of these terms in the context of the claimed invention, and should be adopted.

### a)     "Content"

The '744 patent specification consistently describes "content" as substantive information that the web site or computer application is intending to convey to the user.  The claims themselves make this clear by referring to a "content of said computer application [web site]." The specification also refers to the "content of the website" and "information (content 10)." ['744 patent at 6:40 & 1:31]  Microsoft's proposed construction is consistent with the teachings of the specification, and attempts to provide clarification and assistance to the jury by defining this term by example,[8] just as is done in the specification:  "[Content] includes informative content.  Informative content can include written, recorded, or illustrated documentation, such as photographs, illustrations, product marketing material, and news articles.  Content can be created by writers, photographers, artists, reporters, or editors."  [*Id*. at 1:18-22][9]  Also like the specification, Microsoft's proposed construction emphasizes separation of tasks by noting that content is something that "can be created by writers, photographers, artists, reporters, or editors." [*Id*. at 1:21-22; *see also* 2:22-23:  "[C]hanges in design or content do not require the intervention of a programmer."]

---

[8] In providing such examples of content, Microsoft's construction does not limit "content" to the listed examples, as Vertical contends, which should be apparent from the use of the permissive "can include."

[9] The specification apparently contains a typographical error, as it actually states that "Form includes informative content … ." ['744 patent at 1:18]  The error is apparent from the context of the discussion in the specification, which earlier explains what form and function include.

Vertical's proposed construction, aside from improperly substituting one word ("content") for another ("data"), is improper because it is overreaching. The broad word "data," as used in its ordinary sense (and Vertical provides no additional clues to any special meaning), can mean many things that would be nonsensical in the context of the '744 patent. For example, "data" could be not only user-level information, but also could be the computer-level 1's and 0's that define the objects. This sense of the word "data" would, however, defy the teachings of the '744 patent specification because the purported point of the claimed invention is to "separate" content so that writers, photographers and editors can access it independently without having to get down to the programming level and deal with computer-level data. *See infra* Section III.D.2.

Thus, Vertical's proposed construction also blurs the line between content versus form and functionality, and adopting Vertical's proposed construction would not only effectively rewrite the claims, but would further engender confusion about what "data" means.

### b) "Form"

Microsoft's construction of this term is, again, fully consistent with the teachings of the '744 patent specification. In particular, the '744 patent teaches that "form" is the "look" of the computer application or web site:

- Because functionality is separate from form and content, "a user can easily introduce a new <u>look</u> for the application …" ['744 patent at 2:45-46 (emph. added)];

- Because functionality and content can be syndicated separately from form, this helps a company who "would like to roll out a new <u>look</u>" [*Id*. at 6:32-33 (emph. added)]; and

- "Form" is used interchangeably with "style" and "design." [*E.g.*, *id*. at 1:31, 3:34]

Microsoft's construction of this term, like its construction of "content," also follows a definition-by-example approach, pulling the teachings directly from the specification. [*See* '744

patent at 1:14-16: "Form includes graphic designs, user interfaces, and graphical representations created by a designer or a group of designers."]  Because these types of form are provided by way of example, following the open-ended term "including," Microsoft is not importing limitations from the specification, but is instead providing guidance to the jury.  Microsoft further includes in its construction the notion that "form" is something that "can be created by a designer or group of designers," again to emphasize the separation of form from content and functionality that is repeatedly emphasized by the patent itself.  *See id.*; *see also infra* III.D.2.

Vertical's challenge to Microsoft's proposed construction is premised on the contention that including examples in a claim construction is inherently improper.  Microsoft submits that it is not only proper,[10] but is especially helpful to a jury.  Microsoft's proposed construction is certainly more helpful than Vertical's mere replacement of a claim term ("format") with a variation of that same word ("formatting").

### c)   "Functionality"

Microsoft's construction of the third term in this trio is, again, fully consistent with the teachings of the '744 patent specification.   In particular, the '744 patent teaches that "functionality" is what the web site or computer application does, and a central goal of the claimed invention is to separate this aspect of the computer application from content and form so that programmers can add or modify the functionality without affecting content and form (and vice versa).  [*See* '744 patent at 1:16-18:  "Function includes logical functionality, which can be software code created by a programmer or group of programmers"; *see also* 2:19-23: "[C]hanges in design or content do not require the intervention of a programmer."]

---

[10] *See, e.g.*, *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1382 (Fed. Cir. 2005) (affirming grant of summary judgment of invalidity, and noting that the district court incorporated examples into claim construction).

Microsoft's proposed construction also seeks to eliminate any confusion between software code that defines actions on the web site or in the computer application as implemented by the arbitrary objects on the one hand (which is the sense taught by the patent), versus software code that is used to create the arbitrary objects themselves (or even the form and content).  For example, the specification teaches that "functionality" can be "generated using code to create the complex software application."  ['744 patent at 1:29-30]  The specification similarly teaches that "[f]unction … can include the logical functionality of software code and scripts."  [*Id*. at 3:30-31]  Microsoft's proposed construction also includes a statement, by way of example from the specification, that "functionality" is something that "can be created by a programmer or group of programmers," again to emphasize (consistent with the fundamental purpose of the invention) the separation of functionality from content and form.  [*Id*. at 1:16-18]

Vertical's proposed construction—simply substituting "software code" in place of the claim term "functionality"—is not only unhelpful, but it is confusing.  For example, arbitrary objects, the object library, and underlying computer applications and web sites are all comprised of software code.  Indeed, computer applications and web sites are, at their most basic level, "software code" that represents the "content" and "form" of the application or web site.  Adopting Vertical's proposed construction of "functionality" as merely "software code" would not allow separation of "content" and "form" from "functionality."  Vertical's construction is thus manifestly inconsistent with the teachings of the '744 patent and likely to engender confusion.

### D.      "That Separates a Content of Said Computer Application …"

| Claim Term | Microsoft's Proposed Construction | Vertical's Proposed Construction |
|---|---|---|
| that separates a content of said computer application [web site], a form of said computer application [web site], and a functionality of said computer application [web site] | In which the content, form, and functionality of the computer application [web site] are entities that are independent of each other.<br><br>Prosecution History Disavowal:  no class includes two or more of a content, a form, and a functional method | Treating content, form and functionality as arbitrary objects. |

### 1.      The Term "That Separates a Content of Said Computer Application …" as Used in the Preambles of Claims 1 and 26 Is Limiting

As it did with the term "arbitrary object framework," Vertical again attempts to evade the limiting effect of this language by dismissing this language as merely a statement of purpose in the preamble of the claims.  But this position is completely contrary to the positions taken by the applicant during prosecution of the '744 patent, in which the applicant repeatedly emphasized this very language to differentiate the claimed invention over several prior art references cited by the examiner.  Under these circumstances, clear Federal Circuit precedent mandates that the applicant not be permitted to avoid the limiting effect of the very language that the applicant used to obtain issuance of its patent.  *See, e.g.*, *Halliburton Energy Svcs.*, 514 F.3d at 1255-56 (concluding that term "fragile gel" in preamble was limiting because it was relied upon during prosecution to distinguish over the prior art); *In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1347-48 (Fed. Cir. 2002) (holding that preamble was a limitation because of "clear reliance by the patentee on the preamble to persuade the Patent Office that the claimed invention is not anticipated by the prior art").

The applicant's use of this preamble language during prosecution commenced with the response to the very first Office Action, wherein the applicant asserted that the claimed invention

was distinguishable over the cited Johnson reference because:

> [N]othing in Johnson discloses generating a computer application on a host system that separates a content … a form … and a functionality of a computer application," [sic] and "creating arbitrary objects … for generating said content … said form… and said functionality of said computer application," <u>as claimed in the preamble</u> and second paragraph of claim 1."

[Exh. B.1 (Jan. 28, 2003 Amend. and Resp.) at 4-5 (emph. added)]  The applicant again relied on the preamble language to make the same arguments in later responses in traversing the examiner's rejections over the Lewandowski and Ferrell references, respectively.  [Exh. B.2 (Oct. 22, 2003 Resp.) at 9-10; Exh. B.3 (April 30, 2004 Resp.) at 5-6]

Not only was this preamble language relied on during prosecution, but it is essential to provide antecedent basis for the body of the claim, providing yet another reason why this language should not be deprived of limiting effect.  *See, e.g.*, *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1305-06 (Fed. Cir. 2005) (concluding that preamble was limiting because it provided antecedent basis for limitations in the claim body).  In particular, this disputed claim phrase introduces "<u>a content</u> of said computer application [web site]," "<u>a form</u> of said computer application [web site]," and "<u>a functionality</u> of said computer application [web site]," which are each relied upon in the bodies of claims 1 and 26 for antecedent basis for "<u>said</u> content," "<u>said</u> form," and "<u>said</u> functionality."

Finally, this disputed phrase recites essential features of the purported invention—exactly as asserted by the applicant during prosecution.  *See Bicon, Inc.*, 441 F.3d at 952-53 (affording limiting effect to preamble because it recited essential structural features of the invention).  The specification repeatedly emphasizes that content, form, and functionality are "<u>separate entities independent</u> of each other," so that "modification in one group does not require corresponding modifications in another group."  ['744 patent at 3:34-37 (emph. added); *see also* Abstract:

"The method <u>separates</u> content, form, and function of the computer application so that each may be accessed or modified separately." (emph. added); 2:11-14; 3:16-18]

In short, this disputed language recites the essence of the alleged invention, as the applicant repeatedly insisted to the examiner during prosecution, and provides necessary context for the body of the claim; it cannot be ignored now as a claim limitation.

### 2. Microsoft's Proposed Construction Is Consistent With the Intrinsic Record

Microsoft's proposed construction is fully supported by the intrinsic record, keeping true to the notions that content, form and functionality are "independent" entities.[11]  In particular, the specification teaches that content, form and function are "<u>separate</u> entities <u>independent</u> of each other."  ['744 patent at 3:35-36 (emph added)]  This point is also illustrated graphically in both Figures 2 and 5 of the patent.  In Figure 2, "content," "functionality," and "form" are shown in separate boxes to emphasize their independence:



Similarly, in Figure 5 (*supra*), the WebOS Information Database (content), the code called by the Shell Scripts and CGI Programs (functionality), and the Document Files (form) are shown in separate boxes to emphasize their independence, as is made clear by the description of WebOS on Adhesive's prior art web site.  [Exh. B4 at MSVERT96577][12]

---

[11] To simplify this construction, Microsoft has modified its construction to delete the latter portion, which provided that the entities "do not reference each other, and no change to one requires a corresponding change in either of the other two."  [*See* Exh. B to JCCS  at 7]

[12] Reliance on the prior art description of the WebOS system is appropriate in view of the inventor's inclusion of the WebOS diagram in the '744 patent as well as his express reference to WebOS in the

Vertical's proposed construction, on the other hand, simply reduces content, form and functionality to "arbitrary objects."  This construction makes no sense in the context of the claim language itself, which directs that content, form and functionality are <u>generated by</u> arbitrary objects; they are not themselves arbitrary objects.  [*See, e.g.*, Claim 1:  "arbitrary objects … <u>for generating</u> said content, … said form, … and said functionality …" (emph. added)]  Vertical's construction also conspicuously omits the critical notion of separation of these entities, nor is this notion incorporated by reference to Vertical's construction of "arbitrary object" (which lacks any notion of separation).[13]  The result is a complete disregard for the separation limitation that is underscored over and over again in the patent and the prosecution history as central to the claimed invention (as discussed *supra*).  Simply put, Vertical's proposed construction defies the intrinsic record and cannot be adopted.

### 3.     Applicant Disavowed Claim Scope that Would Allow Combination of Any Two or More of Content, Form and Function

Where the patentee has "unequivocally disavowed a certain meaning to obtain his patent," the doctrine of prosecution disclaimer "attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).  A disavowal may arise, for example, where the patentee clearly characterizes his invention in a particular way to try to overcome rejections based on prior art.

---

patent specification (*see* '744 patent at 5:14-16).  *See, e.g.*, *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1312 (Fed. Cir. 2005) ("[W]hen prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended to adopt that meaning.").

[13] Vertical's proposed construction states that arbitrary objects "can be created independently by individual preference," but this does not necessarily suggest independence of the arbitrary objects or their separation from each other.  "Independently," as used in this definition, modifies "created," suggesting that the process of creation is done independently, not that the end results are independent from each other.  Vertical's proposed construction is thus, again, confusing and potentially misleading.

*See, e.g., Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir.) (limiting the term "transmitting" to require direct transmission over telephone line because the patentee stated during prosecution that the invention transmits over a standard telephone line, thus disclaiming transmission over a packet-switched network), *cert. denied*, 543 U.S. 821 (2004).  The doctrine of prosecution disclaimer protects the public's reliance on definitive statements made during prosecution by preventing claims from being construed "one way in order to obtain their allowance and in a different way against accused infringers." *Chimie v. PPG Indus.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (citation omitted).

In this case, the applicant distinguished his claimed invention over the Johnson reference on the ground that, in Johnson, "one or more of the Johnson classes includes two or more of 'a content … a form … and a functionality of the computer application' and no set of Johnson classes separates 'a content … a form… and a functionality of the computer application,' as claimed in claim 1."  [Exh. B.1 (Jan. 28, 2003 Amend. and Resp.) at 4-5]  The applicant then argued that the Johnson catalog class, for example, included form, function and content methods. [*Id*. at 5]  Microsoft's proposed construction includes an express reference to this prosecution disavowal, stating that "no class includes two or more of a content, a form, and a functional method."  Such a construction is proper because it gives effect to the patentee's disclaimer.  *See, e.g.*, *Bell Atl. Network Servs*, 262 F.3d at 1273-75 (relying on prosecution history to limit claimed "transceiver" to the three stated modes, because of clearly limiting statements made by the patentee to the examiner to overcome a prior art rejection).

## IV.    CONCLUSION

Microsoft respectfully requests that the Court adopt its proposed constructions of the asserted claims as set forth herein and in the claim chart contained in accompanying Exhibit A.

DATED: <u>June 6, 2008</u>                          Respectfully submitted,

/s/ David J. Healey

David J. Healey
*Lead Attorney*
State Bar No. 09327980
david.healey@weil.com
Benjamin C. Elacqua
State Bar No. 24055443
benjamin.elacqua@weil.com
WEIL, GOTSHAL & MANGES LLP
700 Louisiana, Suite 1600
Houston, TX  77002
(713) 546-5000 Telephone
(713) 224-9511 Facsimile

Timothy E. DeMasi
timothy.demasi@weil.com
Ryan R. Owens
ryan.owens@weil.com
Brian Eutermoser
brian.eutermoser@weil.com
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153
(212) 310-8000 Telephone
(212) 310-8007 Facsimile

Anwar Imam
anwar.imam@weil.com
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA  94065
(650) 802-3000 Telephone
(650) 802-3100 Facsimile

**ATTORNEYS FOR DEFENDANT
MICROSOFT CORPORATION**

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this document was served on all counsel who have consented to electronic service.  Local Rule CV-5(a)(3)(A).  Pursuant to Fed. R. Civ. P. 5(d) and Local Rule CV-5(e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by U.S. mail, on this the 6th day of June, 2008.


      /s/ David J. Healey
David J. Healey